**COLORADO ASSOCIATION OF PUBLIC EMPLOYEES; Joseph B. Garver; Bryce Olsen; Shelley Ostrem; Sherman J. Riggin; and Leroy Sanchez, Petitioners–Appellants,**

v.

**DEPARTMENT OF HIGHWAYS; Department of Personnel; Joann Soker, as Executive Director of the Department of Personnel; and the State Personnel Board, Respondents–Appellees.**

**No. 89SA366.**

Supreme Court of Colorado,
En Banc.

April 15, 1991.

Vonda G. Hall, Denver, for petitioners-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Solicitor Gen., Steven A. Chavez, Asst. Atty. Gen., Natural Re-

sources Section, Denver, for respondent-appellee Department of Highways.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Solicitor Gen., Dianne E. Eret, First Asst. Atty. Gen., General Legal Services Section, Denver, for respondents-appellees Department of Personnel and JoAnn Soker, as Executive Director of the Department of Personnel.

No appearance for respondent-appellee the State Personnel Bd.

Justice LOHR delivered the Opinion of the Court.

■■■■ This is an appeal from a declaratory order of the Colorado State Personnel Board (Board) sustaining the authority of the Colorado Department of Highways (DOH) to contract with private sector vendors for services previously performed by state employees within the state personnel system. Certain affected state employees (employees), the Colorado Association of Public Employees and the president of its board of directors (collectively, CAPE) sought a determination that contracts with private sector vendors for such services would violate section 24–50–128, 10B C.R.S. (1988), and article XII, section 13, of the Colorado Constitution, which established the state personnel system. The Board rejected these contentions. We conclude that absent legislative or regulatory guid-ance concerning substitution of private sector providers for state personnel system employees, the DOH action was inconsistent with the state personnel system structure created by the Colorado Constitution. We therefore reverse.[1]

## I.

In December 1988, CAPE and the employees filed a petition for a declaratory order with the Board, averring that certain of the employees were custodial, maintenance and utility workers employed by the DOH, and that the DOH had announced its intention to reorganize and in the course of such reorganization to "contract out" the duties of the employees to persons not within the state personnel system. At least two such contracts, the petition stated, had already been entered. The petition alleged that the contracting out would eliminate thirty-five positions in the state personnel system, and that "[a]ll of the affected positions include duties commonly and historically performed by employees under the state personnel system." The petition also stated that the challenged contracts for personal services required prior approval by the State Personnel Director (Director) under section 24–50–128, 10B C.R.S. (1988), and that they violate the criteria for such personal services contracts set forth in that statute and also contravene article XII, section 13, of the Colorado Constitution. CAPE and the employees sought an

1. This appeal was filed directly in this court, presumably because CAPE raises a colorable challenge to the constitutionality of § 24–50–128, 10B C.R.S. (1988). We have held, however, that the Colorado Court of Appeals has initial jurisdiction to review actions of certain tribunals enumerated in § 13–4–102(2), 6A C.R.S. (1987), even when the constitutionality of a statute is in issue. *Industrial Comm'n v. Adams Cty. Bd. of Cty. Comm'rs,* 690 P.2d 839, 843–44 (Colo.1984). This is because the statutory exception to court of appeals jurisdiction concerning cases in which the constitutionality of a statute is in question extends only to "appeals from final judgments of the district courts" and certain special jurisdiction courts. § 13–4–102(1)(b). § 13–4–102(2)(p) vests initial jurisdiction to review decisions of the Board in the Colorado Court of Appeals. Therefore, initial jurisdiction of this case is in the court of appeals. No party has raised this jurisdictional issue at any time. Any case within the jurisdic-tion of the court of appeals and filed erroneously in the supreme court "shall be transferred to the court of appeals by the supreme court." § 13–4–110(2), 6A C.R.S. (1987). This court, however, can grant a writ of certiorari to review a case pending in the court of appeals before judgment in cases involving matters of substance not previously decided by this court, important unresolved state questions that should be determined by this court, and cases of imperative public importance. C.A.R. 50. We also have authority on our own motion to suspend the rules of appellate procedure in a particular case in the interest of expediting decision or for other good cause shown. C.A.R. 2. Under the unusual circumstances present here, we elect to retain and resolve this case rather than return it to the Colorado Court of Appeals. Because we would be empowered to grant a writ of certiorari before decision by the court of appeals, we are satisfied that this procedure is within our jurisdiction.

order declaring the executed contracts void and "[d]eclaring that the contracting out of any positions held by state employees is in contravention of § 24–50–128 and Article XII, § 13 of the State Constitution."

The Board accepted the petition, under section 24–4–105(11), 10B C.R.S. (1988), and its own rules, accepted a stipulation of relevant facts, and considered briefs filed by the parties. The Board also took administrative notice of other facts and of the history of the state personnel system act. The Board dismissed the petition and ruled that "[t]he contracting out of the duties and functions of any position previously filled by a state personnel system employee is *not* in contravention of 24–50–128, 10B C.R.S. (1988) or Article XII, section 13 of the State Constitution."

On appeal, CAPE and the employees offer three arguments against the validity of the DOH contracts. First, they assert that "contracts with the private sector for services commonly and historically performed by public employees in the state classified personnel system violate Article XII, § 13 of the Colorado State Constitution." Second, they contend that section 24–50–128(2), 10B C.R.S. (1988), unconstitutionally delegates legislative authority because it lacks sufficient standards and safeguards to guide the Director in determining whether to approve contracts for personal services. Third, CAPE and the employees argue that even if section 24–50–128(2) is constitutional, it does not authorize the DOH "to execute and the [Director] to approve contracts with private vendors for job duties performed by employees holding positions in the state personnel system." We conclude that section 24–50–128(2) does not authorize personal service contracts for performance of services historically provided by state personnel system employees and that such contracts so intimately implicate the integrity of the constitutionally established state personnel system that

they cannot be entered into absent legislative or regulatory criteria governing their propriety.

## II.

### A.

Article XII, sections 13, 14 and 15 of the Colorado Constitution (Civil Service Amendment), establishes the state personnel system, which is further developed statutorily by sections 24–50–101 to –142, 10B C.R.S. (1988). That system includes all appointive public officers and employees of the state with certain enumerated exceptions. Colo. Const. art. XII, § 13(2).[2] The Civil Service Amendment was originally adopted in 1918[3] in response to legislative hostility towards a merit-based civil service. *See People v. Bradley*, 66 Colo. 186, 190, 179 P. 871, 872 (1919) (describing the history of the 1918 civil service amendment and taking judicial notice of the history of former legislation concerning civil service). *See also Colorado Association of Public Employees v. Regents*, 804 P.2d 138, 145 (Colo.1990) (background of Civil Service Amendment). The voters sought to safeguard the merit system by incorporating it into the state constitution. *Colorado State Civil Serv. Employees v. Love*, 167 Colo. 436, 446, 448 P.2d 624, 628 (1968).

The state personnel system embodies a number of policies. The basic purpose of the civil service laws is to secure efficient public servants for positions in government. *Colorado Ass'n of Public Employees v. Lamm*, 677 P.2d 1350, 1359 (Colo.1984). Two central features of the Civil Service Amendment are appointment and promotion "according to merit and fitness," Colo. Const. art. XII, § 13(1), and discharge or other discipline only for just cause, *id.* at § 13(8). The personnel system promotes competence in government by requiring the selection of public employees according to merit and fitness as ascer-

**2.** Those exceptions are not applicable to this case. *See* Colo. Const. art. XII, § 13(2).

**3.** The Civil Service Amendment in its present form was adopted in 1970, when the earlier version of article XII, sections 13 and 14, were

repealed and reenacted with amendments designed to modernize and improve the state personnel system. *See Colorado Association of Public Employees v. Regents,* 804 P.2d at 145 n. 9.

tained by competitive tests of competence. Colo. Const. art. XII, § 13(1). Merit based selection and promotion requirements free the state personnel system from political pressures and thereby curtail political patronage. *See Coopersmith v. City & County of Denver,* 156 Colo. 469, 479, 399 P.2d 943 (1965) (purpose of civil service legislation is to protect employees from arbitrary and capricious political action and to insure employment during good behavior). The state personnel system also furthers other state policies by implementing them in the state employment process (e.g., veterans' preferences, Colo. Const. art. XII, § 15; nondiscrimination, § 24–50–101(3)(a), 10B C.R.S. (1988); affirmative action, *id.;* and pay scales, § 24–50–104, 10B C.R.S. (1988 & 1990 Supp.)).

Since the initial adoption of the Civil Service Amendment, this court has zealously protected the integrity of the state personnel system and has not hesitated to strike down statutes authorizing employment or promotion inconsistent with the merit system. *See, e.g., CAPE v. Regents,* 804 P.2d 138 (Colo.1990) (statute purporting to eliminate 2,000 civil service jobs incident to reorganization of University Hospital as a private corporation); *Lamm,* 677 P.2d at 1359–60 (statute allowing "upward allocation of a position" along with employee without competitive tests of competence); *Love,* 167 Colo. 436, 448 P.2d 624 (1968) (statute purporting to exclude certain state employees from civil service as part of reorganization of executive branch); *People ex rel. Kelly v. Milliken,* 74 Colo. 456, 457, 223 P. 40, 40 (1924) (legislation removing incumbent officers by abolishing office and creating a new position with substantially similar duties); *see also Schmidt v. Hurst,* 109 Colo. 207, 217, 124 P.2d 235, 239 (1942) ("promotion" labeled a "transfer" in effort by executive to circumvent competitive examination requirements).

### B.

The process by which the DOH plans to obtain services from private suppliers rather than from classified state employees is commonly referred to as privatization. *See*

R. Cass, *Privatization: Politics, Law and Theory,* 71 Marq.L.Rev. 449, 458 (1988). A primary goal of this process, as demonstrated by the record in this case, is cost savings. The DOH seeks to obtain the necessary services by contract at a lesser expense than that incurred by employing the classified state employees who previously performed this work. The DOH contracts and proposed contracts at issue here directly impact the state personnel system. Thirty-five classified positions will be eliminated, and employees of private companies will perform the work previously accomplished by state employees belonging to the state personnel system. The private sector employees will not be selected by merit and will not be subject to state personnel policies. Thus, privatization departs from traditional state employment practices.

The question before us, framed in its broadest terms, is whether the DOH is authorized to pursue its contemplated plan of privatization. To arrive at an answer, we must analyze the constitutional, statutory, and regulatory framework that creates and implements the state personnel system.

### III.

The Civil Service Amendment states that the "personnel system of the state shall comprise all appointive public officers and employees of the state" with certain enumerated exceptions. Colo. Const. art. XII, § 13. It does not further specify the services that must be performed by state employees and offers no guidance concerning criteria or mechanisms for delineating, enlarging or reducing the personnel system. Embedded in the Civil Service Amendment, however, are protections against termination of employment of persons within the personnel system, Colo. Const. art. XII, § 13(8), including a provision that such persons shall hold their respective positions during efficient service, *id.* The DOH privatization plan would obtain services from private sector providers, thereby eliminating the need to retain the state employees currently performing those services. This would result in the

termination of state employees and elimination of classified positions. This contraction of the state personnel system would implicate the tenure protection features of the Civil Service Amendment.

It was never intended that the provisions of section 13 of article XII would set forth all the features of the state personnel system. The Board, created by section 14 of article XII, adopted contemporaneously with section 13, has an essential role in elaborating upon the framework established by that latter section. Section 14(3) explicitly provides that the Board "shall adopt, and may from time to time amend or repeal, rules to implement the provisions of this section and sections 13 and 15 of this article, as amended, and laws enacted pursuant thereto...." *See In re Interrogatories of the Governor*, 111 Colo. 406, 412, 141 P.2d 899, 902 (1943) (rulemaking is one of the Board's constitutional functions). This provision not only mandates adoption of rules by the Board to implement the Civil Service Amendment but recognizes the legislature's concurrent role in fleshing out the details of the state personnel system. *Accord* Colo. Const. art. XII, § 14(4) (recognizing that laws are to be enacted pursuant to the Civil Service Amendment). *See also* Colo. Const. art. XII, § 13(5), (10) (referring to particular topics for Board promulgated rules); § 24–50–103, 10A C.R.S. (1988) (the structure of the Board). Additionally, section 14 of article XII creates the department of personnel to be headed by the Director. The Director "shall be responsible for the administration of the personnel system of the state under this constitution and laws enacted pursuant thereto and the rules adopted thereunder by the [Board]." Colo. Const. art. XII, § 14(4). *See* § 24–50–102, 10B C.R.S. (1988) (powers, duties and functions of Director). The Colorado Constitution, therefore, contemplates the elaboration of the Civil Service Amendment through laws enacted by the legislature and rules adopted by the Board. The Director, who heads the department of personnel, a department within the executive branch, administers the system, guided and constrained by con-

stitutional, statutory and regulatory provisions. Colo. Const. art. XII, § 14(4).

The general assembly has acted to "provide a sound, comprehensive, and uniform system of personnel management and administration for the employees within the state personnel system," § 24–50–101(1), 10B C.R.S. (1988), by adopting the State Personnel System Act, §§ 24–50–101 to –402, 10B C.R.S. (1988 & 1990 Supp.). As part of that act, the legislature has provided that "[i]t is the duty of the [Director] to establish the general criteria for adherence to the merit principles and for fair treatment of individuals within the state personnel system," and "[i]t is the responsibility of the [Director] to provide leadership in the areas of policy and operation of the state personnel system." § 24–50–101(3)(c). The Director, pursuant to the State Administrative Procedure Act, "shall provide necessary directives and oversight for the management of the state personnel system and in the discharge of his constitutional duty to administer the state personnel system." *Id.* The State Personnel System Act contains various provisions requiring rulemaking by the Board and the creation of systems and plans by the Director to supplement the constitutional and statutory framework of the state personnel system. *E.g.,* § 24–50–104(8) (Board to provide by rule for periodic salary increases based on system of performance evaluation); § 24–50–104(9)(a) (Board to prescribe by rule amount and conditions of annual leave and sick leave); § 24–50–123 (Board to adopt by rule uniform grievance procedure); § 24–50–104(2), (6) (Director to establish compensation and pay plans); § 24–50–104(3) (Director to establish classification system).

■ In accordance with the provisions of the Civil Service Amendment and the State Personnel System Act, the Board has adopted detailed rules, R2–1–1 to R2–2–6, 4 CCR 801–1 (1985) (classification system); R3–1–1 to R3–3–1, 4 CCR 801–1 (1987) (compensation); Policy 5–1 to 5–5, 4 CCR 801–1 (1989) (selection system); R8–3–1 to R8–3–4, 4 CCR 801–1 (1990) (disciplinary actions); R9–3–1 to R9–3–10, 4 CCR 801–1

(1990) (layoffs), and the Director has promulgated procedures, P2–1–1 to P2–2–7, 4 CCR 801–2 (1988) (classification) P3–2–1 to P3–3–2, 4 CCR 801–2 (1990) (compensation) P5–1–1 to P5–6–6, 4 CCR 801–2 (1990) (selection system) P10–1–1 to P10–5–6, 4 CCR 801–2 (1990) (appeals and hearings), to implement the state personnel system. Notably absent from the constitutional, statutory and regulatory framework are any provisions for eliminating positions from the state personnel system and substituting private sector providers to perform under contract the services previously accomplished by persons within the state personnel system.

Privatization of government services has significant policy implications for the state personnel system. Privatization can provide important benefits by reducing costs and increasing governmental efficiency and productivity. *See* Note, *Civil Service Restrictions on Contracting out by State Agencies*, 55 Wash.L.Rev. 419, 424–26 (1980). *See generally* R. Cass, *Privatization: Politics, Law, and Theory*, 71 Marq. L.Rev. 449 (1988). On the other hand, privatization operates as a labor policy in that it affects the qualifications and conditions of employment of persons who will perform services for the government. *See* Becker, *With Whose Hands: Privatization, Public Employment and Democracy*, 6 Yale L. & Pol'y Rev. 88 (1988). Since government is a labor intensive service industry, privatization achieves savings primarily by reducing labor costs. *Id.* at 91.

The competitive cost advantage of the private companies, however, may result from their freedom from the state personnel system. For example, private companies have great latitude in selecting, promoting, transferring and terminating employees;[4] they are not required to employ competitive tests of competence. Absent specific statutory requirements, private contractors need not follow the legislatively mandated pay scales, veteran's preferences, and other employment practices that apply to the civil service. The civil service laws and regulations protect public workers from arbitrary and oppressive treatment, and require due process protections before disciplinary action or termination;[5] private employees lack these protections. These constraints are necessary in government employment to carry out the functions of the civil service, promote competence in government, and ensure a politically independent civil service. These labor policy aspects of privatization, which are essential components of its cost efficiency, have significant consequences for the civil service.

This critical impact of privatization on the state personnel system implicates the legislature's role in structuring the system consistent with constitutional constraints, and invokes both the Board's rulemaking mandate and the Director's duty to provide leadership in state personnel management. The scope and characteristics of any plan of privatization and means by which such a plan is to be implemented require careful consideration. Legislation, rules, or some combination thereof establishing standards will be necessary to ensure that privatization does not subvert the policies underlying the state personnel system. This requires an evaluation of the effects of the concept of privatization on the state personnel system as a whole, rather than a case specific consideration of the effect of a particular privatization plan of a single state agency on individual employees.

■ It is clear that before a privatization plan can be adopted, it is constitutionally necessary that the legislature, the Board and the Director exercise their respective constitutional roles in evaluating the con-

---

**4.** In contrast,
person[s] certified to any class or position in the personnel system may be dismissed, suspended or otherwise disciplined by the appointing authority upon written findings of failure to comply with standards of efficient service or competence, or for willful misconduct, willful failure or inability to perform his duties, or final conviction of a felony or any other offense which involves moral turpitude. Colo. Const. art. XII, § 13(8).

**5.** *See, e.g.,* Colo. Const. art. XII, § 13(8) (a discharged employee has the right to appeal to the Board and "to be heard thereby in person or by counsel, or both.").

cept and supplying the details for implementation of privatization, pursuant to their obligations to delineate the features of the state personnel system. *See* Colo. Const. art XII, §§ 13, 14. At the time relevant to the present case, however, no one had analyzed whether or under what circumstances positions within the state personnel system can be eliminated consistent with the civil service protections in order to obtain the same services by contract with private sector providers. The legislature had not spoken concerning privatization, and no regulatory criteria or guidelines had been adopted by which an executive agency could determine whether privatization is permissible and, if so, under what circumstances.[6] Because privatization so directly implicates both the personnel system as a whole and the specific protections accorded state personnel system employees under article XII, § 13(8), standards regulating privatization must be established by legislation, regulation, or some combination of the two. *Cf. State Farm Mut. Auto. Ins. Co. v. City of Lakewood*, 788 P.2d 808, 815 (Colo.1990) (when analyzing the validity of delegations of legislative power, we examine whether there are sufficient statutory standards and safeguards and administrative standards and safeguards, in combination, to protect against unnecessary and uncontrolled exercise of discretionary power); *Beaver Meadows v. Board of County Comm'rs*, 709 P.2d 928, 936 (Colo.1985) (same); *Cottrell v. City and County of Denver*, 636 P.2d 703, 709 (Colo.1981) (same); *Elizondo v. Motor Vehicle Division*, 194 Colo. 113, 116, 570 P.2d 518, 520 (1977) (legislative delegations of power to administrative agencies are valid only when the legislature provides

sufficient standards to guide the agency's exercise of that power). Absent guidance derived from standards established by statute or rule, we hold that the DOH could not contract out for the custodial, maintenance and utility services at issue consistent with the provisions of the Civil Service Amendment. *Cf.* 1 K. Davis, *Administrative Law Treatise* § 3:15(c) at 213 (2d ed. 1978) (court should invalidate agency action conducted under inadequate statutory and regulatory framework).

## IV.

### A.

The DOH, however, contends it does have legislative authority under section 24–50–124, 10B C.R.S. (1988), to support the termination of the affected employees. That statute recognizes that certified employees can be separated from state service due to "reorganization."[7] We do not construe that term to be so expansive. We believe the legislature had in mind a departmental reorganization that eliminates the need for the specific services previously performed by the terminated employees. Given the constitutional protections accorded civil service employees, *see* Colo. Const. art XII, § 13(8), the legislature could not have envisioned the elimination of state employees' positions by a brief reference to "reorganization" when the department continues to need the services they performed. Whatever the scope of the term, however, any reorganization must still comply with the policies and strictures of the Civil Service Amendment. *Cf.* Colo. Const. art. IV, § 22 (amendment requiring executive department reorganiza-

---

**6.** The Director purported to approve the executed DOH contracts at issue in this case merely by the signature of the Director or her deputy. The contract approvals make no reference to the source of the Director's purported authority. Although the Director later promulgated criteria governing her review, *see* Procedure 13–1–4, 4 C.C.R. 801–2 (1990); *see also* Governor's Exec. Order No. D0109 89 (1989) (State Privatization Review), those criteria cannot retroactively validate her standardless action. We do not address the validity of those subsequent regulations in this decision; we note that CAPE has challenged Procedure 13–1–4 in a case pending

in the Denver District Court. *CAPE v. Colorado Dep't of Personnel*, No. 90CV1172.

**7.** § 24–50–124 provides in pertinent part:

When certified employees are separated from state service due to lack of work, lack of funds, or reorganization, they shall be separated or demoted according to procedures established by rule. Such procedure shall require that consideration be given to performance evaluations of the employees and seniority within the total state service.

tion expressly provides that it does not supersede article XII, § 13); *Colorado State Civil Services Employees Ass'n v. Love*, 167 Colo. 436, 447, 448 P.2d 624, 628 (1968).

The DOH may decide what services it requires; the selection of the persons performing those services necessarily involves the state personnel system. *See Vessa v. Johnson*, 135 Colo. 284, 287, 310 P.2d 564 (1957). As previously analyzed in part III, privatization implicates constitutional protections for employees in the state personnel system. It requires the adoption of statutes, rules, or both, to establish standards governing the permissibility of elimination of positions in the state personnel system in that manner and, if permissible, the circumstances under which such action is authorized. Without such standards, the proposed "reorganization" cannot comply with the Civil Service Amendment.

### B.

The DOH also relies on section 24–50–128(2), 10B C.R.S. (1988), in support of its asserted authority to contract out for the services at issue here. Section 24–50–128 governs contracts with private sector providers for personal services and recognizes two types of personal services contracts. The first type is personal services contracts that create an employer-employee relationship. Subsection (3) governs the validity of such contracts. The second is all other personal services contracts.[8] Subsection (2) limits the power of the executive to enter into the second type of contract if it is for a term longer than six months. The DOH argues that its contracts for custodial, maintenance and utility services do not create an employer-employee relationship, so subsection (2) governs their validity. The DOH then maintains that subsection (2) authorizes the contracts.[9] We need not decide whether the contracts at issue cre-

ate an employer-employee relationship,[10] for we conclude for different reasons that neither subsection authorizes the DOH contracts.

### 1.

■ We consider the validity of the contracts under subsection (3) first. The subsection contains detailed standards governing the approval of personal services contracts by the Director. These detailed statutory standards constrain the Director in deciding whether to approve contracts creating an employer-employee relationship. The DOH contracts are not consistent with these detailed statutory standards.

Subsection (3) states in pertinent part: It is declared to be the policy of the state that contracts for personal services which create an employer-employee relationship shall normally not be used to fill permanent or temporary positions in the state personnel system where the duties of such positions are classified and where such duties are commonly or historically performed by employees in regular positions under the state personnel system.

The custodial, maintenance and utility services to be supplied by the contracts at issue here were commonly and historically performed by classified state employees. The DOH has a continuing need for those services, so the duties should be considered permanent. Since the duties are permanent, proper classified positions currently exist, and the duties were historically performed by classified employees, personal services contracts cannot be used to obtain the services. The DOH contracts, therefore, violate section 24–50–128(3), and are deemed "void from the beginning," § 24–50–128(3), if they are construed to create employer-employee relationships. Moreover, under subsection (3), any personal services contract creating an employer-employee relationship outside the state per-

---

8. Department of Personnel regulations, Bulletin CL–1 (1980), and Procedure 13–1–4, 4 C.C.R. 801–2 (1990), refer to these contracts as independent contractor contracts.

9. The DOH does not address the validity of the contracts under subsection (3).

10. The Department of Personnel regulations and State Fiscal Rules 1.11, 1.12, 1.35.01, 1 C.C.R. 101–3 (1989), provide guidelines for deciding whether a personal services contract creates an employer-employee relationship.

sonnel system cannot exceed six months in a twelve-month period, "nor shall any person be employed longer than six calendar months in any twelve-month period through any combination of a contract and any other type of temporary appointment." § 24–50–128(3). The contracts and proposed contracts at issue here exceed these durational limits and therefore, if construed to create employer-employee relationships, could not be validly approved by the Director and must be considered unauthorized and void.

### 2.

▇ The contention that the DOH contracts are authorized under section 24–50–128(2) if they do not create an employer-employee relationship does not survive close examination. Section 24–50–128(2) provides:

> Contracts for personal services for a term longer than six months in duration shall be reviewed by the state personnel director to determine whether such positions should be brought into the state personnel system.

This statute by the plain meaning of its terms is directed at a review of personal services performed by persons not in the state personnel system to determine whether the system should be expanded to encompass them. Nothing in the statutory language suggests that it was intended to permit the Director to determine whether services historically performed by state employees should be obtained instead from private providers. The need to obtain personal services for a term longer than six months raises the question whether such services could be performed to better advantage, consistent with the purposes of the Civil Service Amendment, by persons

within the state personnel system. A straightforward reading of the statute itself evinces the clear and single legislative purpose to require the Director to review contracts between state agencies and private sector vendors for personal services not being performed by state employees to address that question.

Although it is elementary that if the language of a statute is clear, resort to legislative history is unnecessary to determine its meaning, *People v. Armstrong,* 720 P.2d 165, 167 (Colo.1986), we note that the legislative history of subsection (2) of section 24–50–128 is fully consistent with the plain meaning of the statutory language. This subsection was added in 1972 as part of a total statutory revision of the state personnel system that implemented the constitutional amendments made in 1970. In explanation of the text, the Committee on Personnel stated: "This new language stipulates that the Personnel Director review contracts of employment for six months or longer to fill positions not presently in the system." *Committee on Personnel, Report to the Governor and the Colorado General Assembly,* Research Publ. No. 182, 71 (1971).[11] Accordingly, section 24–50–128(2) neither authorizes the DOH to contract out for services presently performed by persons in the state personnel system nor authorizes the Director to approve contracts entered into for such purpose.[12]

### C.

▇ Finally, the DOH argues that the Civil Service Amendment applies only to personal services contracts that create an employer-employee relationship. It identi-

---

11. Section 26–1–36(1) of the same statutory enactment elaborates upon the arrangements for bringing contract employees into the state personnel system. *See* ch. 38, sec. 1, § 26–1–36(2) (1972 Colo.Sess.Laws 158, 177) (now codified at § 24–50–136(1), 10B C.R.S. (1988)). It is also significant that the committee report contained 35 pages of the committee's statutory recommendations, but contained no reference to contracting with private contractors to perform functions previously accomplished by civil service employees.

12. *University of Southern Colorado v. State Personnel Board,* 759 P.2d 865 (Colo.App.1988), relied on by the DOH, did not adopt the DOH interpretation of § 24–50–128(2). In addressing whether certain certified employees were wrongfully terminated and replaced by contract services obtained from a private security firm, the court focused on whether the contract services created an employer-employee relationship not meeting the standards of § 24–50–128(3), and remanded to the Board for determination of that issue.

fies several statutory provisions that authorize the state to procure goods and services through contract. *See, e.g.,* §§ 24-101-101 to -112-101, 10B C.R.S. (1988) (Procurement Code) (the DOH refers specifically to § 24-101-105); §§ 24-30-1401 to -1408, 10A C.R.S. (1988) (consultant contracts with architects, engineers, landscape architects and land surveyors) (the DOH refers specifically to § 24-30-1402). *See also* § 6-2-115.5, 2 C.R.S. (1990 Supp.) (contracts with private enterprise). The DOH argues that these provisions express an implicit legislative interpretation that the Civil Service Amendment relates only to contracts that create an employer-employee relationship.

We reject this hypothesized legislative construction. These provisions do not mention the Civil Service Amendment, or purport to delineate its scope. These provisions overlap only marginally with the Civil Service Amendment; there is no reason to presume that they reflect a legislative interpretation of that constitutional provision. Moreover, we presume the legislature intended that state agencies would exercise the contractual authority granted by these statutes in compliance with the Civil Service Amendment. § 2-4-201(1)(a), 1B C.R.S. (1980).

In addition, the identification of the legal relationship created by the DOH contracts—employer-employee on the one hand and independent contractor on the other—cannot be the sole factor determining the applicability of the Civil Service Amendment. If carried to its logical extreme, the DOH's argument would permit it to replace all its classified employees with private sector providers so long as the contracts do not create an employer-employee relationship. Given the myriad applications for privatization, contracts with private sector providers could result in the elimination of a large number of state personnel positions, and thereby implicate the concerns underlying the Civil Service Amendment. *See CAPE v. Regents,* 804 P.2d 138, 145 (Colo.1990). Such contracts also involve the selection of persons performing personal services for the state, as well as the compensation for those personal services.

Matters of this kind are firmly within the purview of the state personnel system. Colo. Const. art. XII, §§ 13(1), (8); §§ 24-50-104, -111, 10B C.R.S. (1988). These fundamental personnel issues cannot be resolved without legislative or regulatory guidance.

## V.

The DOH contracts and proposed contracts could not validly be approved by the Director absent adoption of statutory or regulatory criteria. We reverse the declaratory order of the Colorado State Personnel Board upholding the "contracting out" of duties and functions of custodians, maintenance workers and utility workers at issue in this case.