Richard W. BARDSLEY, Jr., Leonard A. Boulas, Larry C. Ledwick, David H. Lawton, Harvey E. Swan, G. Carolyn Richardson, Melvin L. Richardson, David Warren Holm, Susan R.G. Clark, Elma Eldredge, Daniel Arthur, Burnham, Wayne A. Schomaker, Billie K. Cook, James R. Seaver, Godfrey John Everitt, Ronald R. Costa, Frank J. Mollner, Mary Anne Longrigg, and Cheryl D. Miller, Complainants–Appellants,

v.

COLORADO DEPARTMENT OF PUBLIC SAFETY—DIVISION OF DISASTER EMERGENCY SERVICES, Respondent–Appellee,

and

State Personnel Board, Appellee.

No. 92CA1853.

Colorado Court of Appeals, Div. I.

Feb. 24, 1994.

Vonda G. Hall, Denver, for complainants-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Stacy L. Worthington, Asst. Atty. Gen., Denver, for respondent-appellee.

No appearance for State Personnel Bd.

Opinion by Judge CRISWELL.

Complainants, all of whom are former certified state employees of the Division of Disaster Emergency Services (DODES), appeal from the decision of the State Personnel Board that approved the order of an Administrative Law Judge (ALJ) in the nature of a summary judgment, dismissing the complainants' petition for relief. That petition asserted, *inter alia,* that the Governor had violated Colo. Const. art. XII, § 13, by abolishing DODES and by transferring its functions from the Department of Public Safety (DPS) to a new office, the Office of Emergency Management (OEM), in the Department of Local Affairs (DOLA), without allowing complainants to transfer to the new positions in OEM. We reverse and remand the cause to the Board for further proceedings.

The background facts which gave rise to complainants' grievances are substantially undisputed and disclose the following:

In 1983, the General Assembly adopted a statute creating DODES as a division in DPS. The principal functions of the division were to prepare a "state disaster plan," which was to consider all manner of disasters, resulting from nature and from human activities, and to attempt to coordinate local, state, and federal disaster activities. Colo. Sess.Laws 1983, ch. 273, § 24–33.5–705 at 940–942.

As of October 1991, there were approximately 31 full-time employees or their equivalents (FTEs) employed in this division. Of these employees, some 20.5 FTEs were funded from both federal funds and from the state general fund. Another 9.5 FTEs relied for their funding entirely upon federal funds, and 1 FTE was funded from the Highway

Users Tax Fund, which is a source different from the state general fund.

In that month, the Governor issued executive order D001591 in which he exercised his authority under § 24–75–201.5, C.R.S. (1993 Cum.Supp.) to adopt a "budget reduction plan." This order was based upon the Governor's finding that revenue estimates for the then current fiscal year, based on appropriations then in effect, would cause general fund expenditures to use one-third or more of the reserve required to be maintained by § 24–75–201.1(1)(d), C.R.S. (1993 Cum.Supp.).

Section 24–75–201.5(1)(b), C.R.S. (1993 Cum.Supp.) provides that, for fiscal year 1991–1992:

> [W]henever the revenue estimate ... indicates that general fund expenditures for such fiscal year ... will result in the use of one-third or more of the reserve required by section 24–75–201.1(1)(d), the governor shall formulate a plan for reducing such general fund expenditures so that said reserve, as of the close of the fiscal year, will be at least two-thirds of the amount required by said section 24–75–201.1(1)(d). The governor shall promptly notify the general assembly of such plan. Such plan shall be promptly implemented by the governor, using the procedures set forth in section 24–2–102(4), 24–30–206(3), or 24–50–109.5 or any other lawful means.

Section 24–2–102(4), C.R.S. (1993 Cum. Supp.), one of the statutes referenced by § 24–75–201.5(1)(b), provides, in pertinent part, that, if the Governor learns that:

> If ... there are not sufficient revenues ... to carry on the functions of the state government and to support its agencies and institutions [the governor] by executive order ... may *suspend or discontinue*, in whole or in part, *the functions* of any department ... of the state government.... Such *discontinuance or suspension* shall become effective upon the first day of the calendar month following the entry of such executive order and shall continue for such period of time, *not to exceed three months*, as shall be determined by such executive order. If, during

any such period of time, it again appears to the governor that such deficiency of revenues still persists, from time to time, he may extend the operation of such executive order for a like period of time *not to exceed three months*.... (emphasis supplied)

Section 24–30–206(3), C.R.S. (1993 Cum. Supp.), the second statute referred to by § 24–75–201.5(1)(b), is not applicable to this controversy. Section 24–50–109.5(2), C.R.S. (1993 Cum.Supp.), also referred to by § 24–75–201.5(1)(b), however, provides that, in the case of a "fiscal emergency" as declared by the General Assembly, the Governor must take such actions as may be necessary "to reduce state personnel expenditures." This statute also specifically provides that:

> Such actions shall include, but need not be limited to, *separations*, voluntary furloughs, mandatory furloughs, suspension of salary and fringe benefit survey increases, suspension of merit increases, job-sharing, hiring freezes, forced reallocation of vacant positions, or a combination thereof. (emphasis supplied)

In the Governor's executive order, his budget reduction plan called for numerous departments to undertake various steps to reduce expenditures. With respect to DODES, it called for *"[e]limination* of division, and associated FTE." (emphasis supplied)

While this executive order expressly provided that the budget reduction plan was to take effect on November 1, 1991, and was to terminate on January 31, 1992 (a period of three months), DODES was not "eliminated" as of the former date, and none of the complainants' positions was eliminated at that time. Rather, after a conference participated in by representatives of both DPS and DOLA, among others, the DODES employees were given a memorandum explaining "how the disaster emergency services needs of the state will be handled in the future and what rights [a DODES employee will] have as a laid off DODES employee."

In general, this memorandum said that DOLA would carry out a "reduced level of functions now assigned to DODES"; that

"many jobs will be restructured and will therefore not directly correspond to the jobs which currently exist in DODES"; that other jobs might be "similar to current jobs," but would be placed "into new departments for efficiency and coordination purposes". It further provided that no present DODES employees would be transferred to such new jobs, either in DOLA or elsewhere; that such employees, under § 24–50–124, C.R.S. (1988 Repl.Vol. 10B), would have reemployment rights only within DPS and could not exercise such rights in DOLA or in any other department; that, when the new jobs were established, the Department of Personnel would make those "jobs opportunities known to interested employees," and the departments within which such positions are created "will then select employees" for those positions; and that, should any employee be hired for such a new position, the "reentry" provisions of the Board's rules would apply so that such employee would be required to serve a new probationary period and could be paid at any step in the pay grade established for the new position.

On December 31, 1991, the Governor issued a second executive order in which he referred to his previous order, but noted that, in spite of that order's "elimination" of DODES, it was still necessary to protect the public safety should a disaster emergency occur. This second order, therefore, purported to create OEM within the division of Local Government in DOLA and to transfer to that office "the authority to assume *all* of the powers and responsibility" that had previously been possessed by DODES. (emphasis supplied)

When this second executive order was issued, all of the complainants were placed on layoff status. While the record does not provide precise information upon this point, it appears that OEM was intended to be staffed by some 20 FTEs (as contrasted with the 31 FTEs in DODES). The extent to which these new positions in OEM called for substantially the same qualifications and involved substantially the same responsibilities as any of the previous positions in DODES is, as the ALJ specifically found, a matter of genuine dispute, which was not resolved by the ALJ's findings.

Consistent with the memorandum previously issued, none of complainants were transferred to any of the new positions in OEM. Several, however, were offered employment in such jobs, and several accepted such employment under protest. The record does not contain evidence disclosing the criteria used to select the employees who were offered such employment, and it is not clear whether their appointments were permanent or merely provisional.

In any event, it is undisputed that any former DODES employee who was offered and accepted employment in OEM was treated as a new employee, at least to the extent that he or she was required to serve a probationary period, was not credited with prior annual leave or sick pay credits (all former DODES' employees having received payment for accrued benefits to the extent authorized by law), and his or her pay was subjected to those social security deductions required of a new employee.

After the General Assembly convened in January, 1992, it adopted Senate Bill 92–36, Colo.Sess.Laws 1992, ch. 144 at 1010–1045, which became effective March 12, 1992. That statute abolished DODES, created OEM, and transferred the "powers, duties, and functions" of DODES "by a Type 3 transfer" to DOLA. Such powers, duties, and functions were "allocated" to OEM. Colo.Sess.Laws 1992, *supra,* § 24–1–125(7)(b) at 1010.

Except for its reference to the nature of the transfer, this statute did not address the question whether any of the former DODES' employees were to be transferred to OEM. However, § 24–1–105(3), C.R.S. (1988 Repl. Vol. 10A) defines a "type 3" transfer, as the General Assembly characterized the transfer to OEM, as:

> the *abolishing* of an existing department, institution, or other agency and the *transferring* of all or a part of its powers, duties, functions, records, [and] personnel ... to a principal department as specified under this article. (emphasis added)

Before the ALJ, complainants asserted that the Governor's actions taken in the two pertinent executive orders were unlawful because the statutes purporting to authorize such actions were unconstitutional and because those orders violated both those statutes and Colo. Const. art. XII, § 13 (the Civil Service Amendment). The ALJ rejected these assertions, however, and entered summary judgment against complainants. The Board adopted the ALJ's findings and conclusions, and complainants appeal from that order.

## I.

We note that DPS asserted before the ALJ that, because the Governor was not made a party to these proceedings and because it was not responsible for the Governor's actions, the validity of those actions could not be reviewed by the Board. However, the ALJ rejected this assertion, the Board approved that conclusion in its order, and DPS has not pressed that assertion in this court.

■ Under these circumstances, we conclude that DPS has abandoned its contentions upon this point, see *Western Assurance Co. v. Bronstein*, 77 Colo. 408, 236 P. 1013 (1925), and we do not pass upon the question whether the issues respecting the validity of the Governor's actions can normally be raised in administrative proceedings such as these. Rather, we treat such issues as having been properly raised and determined by the Board and properly presented for our review. *Cf. Horrell v. Department of Administration*, 861 P.2d 1194 (Colo.1993).

## II.

Complainants first argue that, under the pertinent statutes, the Governor could not eliminate those positions in DODES that were wholly funded through federal funds—and for which no state general funds were required—because the elimination of federally funded positions would not reduce state general fund expenditures. Based on the record made here, we disagree.

■ When faced with the prospect that expenditures from the general fund will result in the depletion of general fund reserves below the specified level, § 24–75–201.5(1)(b) expressly requires the Governor to undertake steps to reduce general fund expenditures. In formulating a plan to reduce such expenditures, the Governor is specifically authorized to "suspend or discontinue" the functions of "any department," either "in whole or in part." Section 24–2–102(4). Further, his actions may take the form of personnel "separations" or other personnel actions. Section 24–50–109.5(2).

While the purpose of these statutes is to decrease general fund expenditures, none of them specifically limits the Governor's authority to suspend or discontinue only those functions, or to separate from service only those employees, which are dependent solely on the state's general fund for their operation. And, given the purpose behind these provisions, which is to allow the Governor to act on the basis of immediacy, we cannot read into them a limitation that cannot logically be derived from their terms.

■ Further, even if some limitation might be implied in other circumstances, complainants here have failed to come forward with evidence demonstrating the functional or operational independence of the positions funded solely from federal funds. On the contrary, so far as appears from this record, the interdependence among the former positions in DODES, whatever the source of their funding, is vital to the fulfillment of the emergency disaster plan adopted by it. Hence, we must assume that the Governor could not adopt any reasonable budget reduction plan with respect to DODES' functions that would have impacted only those employees whose positions were wholly funded from the state's general fund. *See Zagar v. Colorado Department of Revenue*, 718 P.2d 546 (Colo.App.1986) (administrative agency's interpretation of statute entitled to deference; administrative action not to be overturned absent clear abuse of discretion). Under such circumstances, suspending the work of the positions in DODES,

irrespective of the source of the funds for any of those positions, was warranted.

## III.

Complainants' principal constitutional assertion is that the permanent abolition of DODES, the transfer of its functions to OEM, and the creation of new positions in the latter office to perform those functions, without recognizing complainants' right to fill those new positions, violated Colo. Const. art. XII, § 13 (the Civil Service Amendment). While this record is insufficient to allow this court to resolve this issue, we nevertheless agree that the evidence before the ALJ presented a genuine dispute with respect to the facts material to this claim, rendering improper the entry of a summary judgment denying complainants' constitutional assertion.

## A.

Colo. Const. art. XII, § 13(8), provides:

Persons in the personnel system of the state shall hold their respective positions during efficient service or until reaching retirement age, as provided by law.

The statute adopted by the General Assembly, which had the effect of approving the Governor's transfer of functions from DPS to DOLA, specifically provided that the transfer was to be a "type 3" transfer. Arguably, the General Assembly, in authorizing such a transfer, intended for employees of the abolished agency, whose functions were to be transferred to another agency, to be able to transfer to the new agency, at least on a *pro tanto* basis. *See* § 24–1–105(3), C.R.S. (1988 Repl.Vol. 10A); *State Highway Commission v. Haase*, 189 Colo. 69, 537 P.2d 300 (1975).

■ More importantly, however, our supreme court, for more than 70 years, has made clear that neither the executive branch nor the legislature can deny to certified state employees the tenure rights granted to them by the Civil Service Amendment. Hence, a certified position may not be abolished and the incumbent employee terminated if a new

position is created with substantially the same duties and responsibilities as the old position, but filled by another employee.

The first case in which this principle was announced was *People ex rel. Fulton v. O'Ryan*, 71 Colo. 69, 204 P. 86 (1922). There, the General Assembly's annual appropriation bill failed to provide any funds for an existing position. However, it purported to create a new position, having substantially the same responsibilities as the old one, and it provided funds for the new position, which was filled by a new employee. Our supreme court, relying upon decisions from the courts of Georgia, Indiana, Louisiana, Maryland, Mississippi, Pennsylvania, Tennessee, and Wyoming, concluded that:

[Such legislation was] in violation of the Civil Service Amendment, for it is evident that, if the Legislature may merely change title of an office and attach the duties and salary of the old name to a new one, the Civil Service Amendment is a nullity.

71 Colo. at 70, 204 P. at 87.

This principle was emphasized the following year by the often-cited opinion in *People ex rel. Kelly v. Milliken*, 74 Colo. 456, 223 P. 40 (1923). There, again, the General Assembly attempted to abolish several old offices and to create new ones with substantially the same duties to which new employees were to be appointed. The supreme court specifically held that new employees could not be appointed to the new offices created, but such offices, if filled, were required to be filled by the former employees. Holding that the Civil Service Amendment creates tenure rights that cannot be infringed, the court noted that:

That body [the General Assembly] has, indeed, the power to abolish the office, but it may not avoid the Constitution by abolishing the office and creating a new one with duties substantially the same, to which new officers are appointed.

*People ex rel. Kelly v. Milliken, supra*, 74 Colo. at 457, 223 P. at 40.

This principle was most recently re-affirmed in *Colorado Ass'n of Public Employ-*

ees v. Board of Regents, 804 P.2d 138 (Colo. 1990). There, pursuant to legislative authorization, the board of regents of the University of Colorado purported to establish a private corporation to operate University Hospital. The hospital employees, who were certified state employees, were required either to cease their public employment immediately and to become employees of the private corporation or to continue, for no more than two years, to work for the hospital as state employees, at which time their employment was to cease.

The supreme court first concluded that the corporation was not a private entity; rather, because of the control retained by the board of regents, the reorganized hospital remained a public entity. It then determined that the nature of the jobs at the reorganized hospital remained the same; the changes at the hospital "were changes of form, not substance...." The court concluded, therefore, that the case presented was one that "resemble[d] closely the situation in *People ex rel. Kelly v. Milliken*," except "on a larger scale." Hence, "[b]y analogy, a mere change in the nomenclature of the hospital does not change the essence of the employee's position for purposes of civil service." *Colorado Ass'n of Public Employees v. Board of Regents, supra,* 804 P.2d at 146. The hospital employees, therefore, could not be deprived of their civil service positions as employees of the hospital.

In a somewhat different context, it has also been held that, absent the adoption of appropriate criteria either by the General Assembly or by the State Personnel Board, the executive may not displace state employees by engaging a private firm to perform the functions previously performed by those employees. *Horrell v. Department of Administration, supra,* and *Colorado Ass'n of Public Employees v. Department of Highways,* 809 P.2d 988 (Colo.1991).

■ This jurisprudence teaches that the rights granted by the Civil Service Amendment to a certified state employee include the right not to be displaced by the abolition of the position occupied and the creation of a new position which is required to perform substantially the same service. *See Tising v. State Personnel Board,* 825 P.2d 1011, 1014 (Colo.App.1991) ("contrary to [the appointing authority's] contention, we conclude that it is unnecessary for complainants to establish that the private security guards perform all of the services previously undertaken by complainants").

■ The question whether complainants' rights here were violated by the executive's failure to transfer any of them to the new positions in OEM, then, depends upon whether the nature of the 20 new positions created in OEM, or any of them, required substantially the same qualifications and entailed the performance of substantially the same functions as did any of the 31 former positions in DODES. If so, to the extent that any of these new positions substantially duplicated the old positions, the affected former DODES' employees were entitled to be transferred to those new positions without any loss of their previously vested benefits. The failure to allow such transfers under such circumstances would have violated the Civil Service Amendment.

■ However, in entering a summary order dismissing complainants' constitutional claims, the ALJ did not address this issue. On the contrary, she recognized that the question of the similarity between the positions was the subject of a genuine dispute, but she concluded that such issue was not legally relevant to complainants' claim.

To the contrary, we conclude that the question of similarity in positions is the decisive question that must be addressed in assessing complainants' claim that the denial of their right to be transferred was violative of the Civil Service Amendment. Hence, it is necessary for the cause to be remanded to the ALJ for further proceedings designed to resolve this factual question and for the entry of a further appropriate order based upon that determination.

B.

DPS argues that the settlement of a grievance filed by the former DODES' employees who were re-employed by OEM prevents

those grievants, some of whom are also complainants here, from challenging their status in the new positions. We do not pass upon this question, but leave it to be resolved in the further administrative proceedings herein ordered.

DPS has failed to make any part of that former grievance proceeding a part of this record. We cannot, therefore, judge whether the settlement of the claims made in those proceedings had any legal effect upon the issues presented to us. *See A.B. Hirschfeld Press, Inc. v. City & County of Denver,* 779 P.2d 1356 (Colo.App.1988), *aff'd,* 806 P.2d 917 (Colo.1991).

Hence, the question will remain open for resolution on remand.

## IV.

■ Complainants also argue that, while the statutes relied upon by the Governor for his actions may authorize the temporary *discontinuance* of a department's functions and the consequent layoff of employees involved in those functions, they do not authorize the Governor's *abolition* of a statutorily created agency of state government, such as DODES, and the *transfer* of such functions to another principal department, without prior legislative authorization. We also agree with this assertion.

## A.

The two executive orders issued by the Governor, in addition to referring to the statutes referred to above, also relied upon Colo. Const. art. IV, § 2 (which vests the "supreme executive power" of the state in the governor) and Colo. Const. art. X, § 16 (which provides, generally, that appropriations and expenditures cannot exceed the proceeds from taxation). However, the Attorney General has not argued before us that either of these constitutional provisions constitutes an independent grant of power authorizing the Governor to abolish a legislatively-created division within a principal department, and to transfer its functions to another department, without prior legislative approval. Rather, the propriety of the Governor's actions has been supported solely by reference to the pertinent statutes. Hence, nothing within this opinion should be construed as determining the extent of the Governor's powers under the two constitutional provisions recited in the executive orders; our consideration of the issues raised is limited to an analysis of the pertinent statutes.

## B.

As noted, if it appears that continuing expenditures at current levels will result in the reduction of the statutory reserve below two-thirds of the amount required to be maintained, § 24–75–201.5(1)(b) authorizes the Governor to formulate an expenditure reduction plan. The "procedures" to be used in the implementation of such a plan are, insofar as may be relevant here, those set forth in § 24–2–102(4) and § 24–50–109.5(2). In addition, § 24–75–201.5(1)(b), C.R.S. (1993 Cum.Supp.) requires that, upon its adoption, "[t]he governor shall promptly notify the general assembly of such plan."

Section 24–2–102(4) authorizes the Governor to "suspend or discontinue, in whole or in part, the functions" of any department. It also provides, however, that such discontinuance or suspension shall continue for not more than three months, except that, if the deficiency in revenues continues, the Governor can, from time to time, extend the suspension for additional periods not to exceed three months.

Finally, § 24–50–109.5(2) authorizes the Governor to reduce expenditures for state personnel and describes the nature of the personnel actions that may be taken. It requires the Governor to seek the advice and assistance of the state personnel director and provides that "each principal department" must use the methods prescribed by the Governor to reduce its personnel expenditures.

None of these statutes makes any reference to the *transfer* of functions between principal departments.

Yet, Colo. Const. art. IV, § 22, specifically provides that the "*functions,* powers, and duties" of all executive and administrative offices, agencies, and instrumentalities "*shall be allocated by law*" among the principal departments. (emphasis supplied) In addi-

tion, this constitutional provision expressly provides that its terms are not intended "to supersede the provisions" of the Civil Service Amendment.

In light of this constitutional requirement, we cannot infer without a valid basis for such reference, that the General Assembly delegated its responsibility to allocate governmental functions among the principal departments to the Governor. Even if we assume that this constitutional provision would not prohibit such delegation, at least on a temporary emergency basis, we see nothing within the pertinent statutes evidencing any legislative intent to do so.

### C.

 DPS argues, however, that, because the General Assembly approved the Governor's actions by its adoption of Senate Bill 92–36, the question of the validity of the Governor's actions has become moot. We disagree.

The Governor's second executive order became effective December 31, 1991. Senate Bill 92–36 did not become effective until March 12, 1992. Yet, the transfer of functions and the personnel separations became effective on the former date. To the extent that any complainant may have sustained a loss between these two dates as a result of the Governor's improper transfer of functions to DOLA (as distinguished from the effect of the decrease in personnel performing those functions), he or she would be entitled to recompense. *See Department of Health v. Donahue,* 690 P.2d 243 (Colo.1984) (state probationary employee dismissed without pre-termination meeting entitled to receive backpay from date of dismissal to date probationary period would have ended).

If, for example, the positions in DODES had simply been reduced in number in a cost saving effort, but had not been transferred from the DPS, many of the complainants might not have been laid off at that time. In addition, some of the laid-off employees might have been entitled to exercise their retention rights under § 24–50–124 to the remaining jobs for the period between De-

cember 31, 1991, the date of their termination, and March 12, 1992, when the new statute became effective.

At least to this extent, therefore, the question of the validity of the Governor's action in abolishing DODES and transferring its functions to OEM has not become moot.

The order of the Board is reversed, and the cause is remanded to it for further proceedings consistent with the views expressed in this opinion.

ROTHENBERG and PIERCE *, JJ., concur.