DEPARTMENT OF HUMAN SERVICES, Division of Youth Services, Lookout Mountain Youth Services Center; Department of Higher Education, Metropolitan State College of Denver; and State Personnel Board, Petitioners,

v.

In re the Petition of Thomas L. MAY, Frank Vallero, John Wharrier, and The Colorado Association of Public Employees, Respondents.

No. 98SC600.

Supreme Court of Colorado,
En Banc.

April 24, 2000.

As Modified on Denial of Rehearing
June 5, 2000.*

* Justice COATS does not participate.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Christine M. Arguello, Deputy Attorney General, Coleman M. Connolly, Assistant Attorney General, Stacy L. Worthington, Assistant Attorney General, Employment Section, Denver, Colorado Attorneys for Petitioners Department of Human Services and Metropolitan State College of Denver.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Christine M. Arguello, Deputy Attorney General, Kristin F. Rozansky, Assistant Attorney General, Business and Licensing Section, Denver, Colorado, Attorneys for State Personnel Board.

Vonda G. Hall, Denver, Colorado, Attorney for Respondents.

Justice KOURLIS delivered the Opinion of the Court.

This case challenges the creation of a "Lab School" at the Lookout Mountain Youth Services Center (Lookout Mountain) juvenile corrections facility. The Lab School is a partnership between the Office of Youth Services (OYS)[1] and Metropolitan State College

---

1. In the early 1990s, the agency was called the Division of Youth Services. At the time the Administrative Law Judge adjudicated the grievances, the agency was called the Office of Youth Services (OYS). The agency is now called the

of Denver (Metro) under which Metro provides educational programming at the Lookout Mountain facility. The Lab School program is designed to address deficiencies in the state's education and training programs for juvenile offenders.

The reorganization that led to the creation of the Lab School included transferring existing Lookout Mountain teachers to other positions within the Department of Human Services (DHS) or to teaching positions under Metro's direction that were exempt from the state personnel system. Several teachers who were transferred within the Department and the Colorado Association of Public Employees (CAPE) now contend that the transfers of employees, and the agreement as a whole, violated the Civil Service Amendment to the state constitution and the state personnel system statute.

Although an Administrative Law Judge originally upheld the agreement and the transfers, the court of appeals later reversed, holding that the agreement violated the state constitution. *See May v. Department of Human Servs., Office of Youth Servs.*, 976 P.2d 281 (Colo.App.1998).

We granted certiorari to address whether the transfers of the complainants violated existing law. We also granted certiorari to determine whether DHS had the statutory authority to enter into the contract with Metro. We now hold that the agreement and the exemption of the Lab School positions from the state personnel system were constitutional because the new Lab School instructors are effectively employees of Metro, and thus, are exempt from the state personnel system. We also conclude that the complainants were not improperly transferred within the civil service system. The complainants retained full pay, status, and seniority. Any other changes in their positions, such as changes in

duties, hours, or job location, were job modifications within the agency's discretion. Lastly, we determine that DHS had the statutory authority to enter into the agreement with Metro. We, therefore, reverse.

## I.

### A.

■ Lookout Mountain is Colorado's largest and most secure institution for juveniles.[2] Juveniles are committed to Lookout Mountain for serious crimes ranging from murder or rape to property offenses. The average incarceration period is one year, but juveniles may be incarcerated there for as long as five years. Lookout Mountain also provides short-term detention for youth awaiting trial. The juveniles range in age from twelve to twenty-one, and over half are minorities. Many have committed gang-related offenses in urban areas of the state and struggle with drug and alcohol abuse. Juveniles typically enter Lookout Mountain with educational abilities three to four grade levels below their age group. The majority of the students test as learning disabled or emotionally handicapped. As a result of these complex problems, Lookout Mountain juveniles often commit repeat offenses, with historically more than one-third committing new crimes within one year of release.

Lookout Mountain, like other juvenile facilities, has a responsibility to provide education and training services. In the early 1990s it became apparent that Lookout Mountain was failing to educate and train its students. The teaching techniques used by the school failed to hold the youths' attention and teachers had difficulty handling the students in the classroom. Students performed below grade level and were not earning

---

Division of Youth Corrections. We adopt the name OYS to be consistent with prior decisions.

OYS is a division within the Department of Human Services (DHS). *See* § 24–1–120, 7 C.R.S. (1999). Although the Lab School agreement was entered into by OYS, throughout the opinion we refer to DHS as the party to the agreement, and we examine DHS's authority to enter into the agreement. We refer to DHS because it is the parent agency and because the juvenile facilities statute places the responsibility

for juvenile offender education with DHS. *See* §§ 19–2–401 to –416, 6 C.R.S. (1999).

2. We do not rely solely on the findings of fact made by the ALJ, but rather conduct our own review of the record to determine whether substantial evidence exists on the record to support the findings and conclusions of the agency. *Cf. Lassner v. Civil Serv. Comm'n*, 177 Colo. 257, 259, 493 P.2d 1087, 1088–89 (1972).

GEDs or gaining vocational training. From 1990 to 1993, the percentage of Lookout Mountain students who returned to school or to employment after release declined from 52% to 32%.

Prior to the reorganization, educational programs and theories at Lookout Mountain came and went. The agency overseeing the facility, OYS, could not offer any expertise to help teachers plan programs for the special needs of delinquent students. There was no centralized curriculum planning, and the curriculum that existed was loosely followed. A lack of funding often resulted in a shortage of supplies and equipment. Many teaching positions were unfilled or were filled with temporary employees, and because the school operated year round, teachers received no continuing education.

The new director of OYS, F. Jerald Adamek, determined that the educational programs at Lookout Mountain were not adequate. He visited the school, and later testified that kids were "watching television, reading newspapers, sitting with their feet on the desk, [and] staring out windows." He then commissioned a study by an independent education consultant to review the school's performance. The study confirmed Adamek's concerns that students were not receiving meaningful education and that the teachers had lost their enthusiasm.

To respond to these concerns, Adamek pursued a partnership with Metro to provide innovative educational programming. In May 1994, DHS and Metro entered into a five-year agreement to create the year-round Lab School on the Lookout Mountain campus.[3] The new, innovative, educational program includes a full array of academic and vocational programs, as well as a post-secondary component. The vocational program covers culinary arts, medical technology, landscaping, auto services, construction trades, and computer programming. The intent of the project is to provide education,

training, and support services to assist juveniles with successful reentry into society.

The agreement also benefits Metro. The college was particularly interested in developing expertise in educating urban youth, since many of its students work in urban school districts following graduation. The project relies in part on student teachers at the Lab School, affording the young teachers training and real-world experience. The Lab School also provides a forum for research on new strategies for working with at-risk children. Metro students in other disciplines such as criminal justice, sociology, psychology, and other human services also have the opportunity to participate at the school and receive training.

The agreement allocates responsibilities at Lookout Mountain between DHS and Metro. DHS provides staff support, retains control of the building, and maintains responsibility for security and other operations at the facility. DHS funds the Lab School from its appropriation, and thus, is accountable to the General Assembly for the success of the project. In return, Metro provides year-round educational services, computer software, and surplus equipment. Metro controls the day-to-day operations of the teachers: it determines the curriculum, hires and pays the teachers, makes assignments, evaluates performance, and disciplines teachers.

Metro employees are not covered by the state personnel system. Prior to the agreement, all of the teachers at Lookout Mountain were part of the classified service system; however, the agreement provided that the new Lab School employees under Metro's direction would be nontenured employees.[4] Thus, Metro applied to the Colorado Department of Personnel for exemptions for the new Lab School positions from the state personnel system. The Department of Personnel granted the requests, finding that the Lab School positions were "professional staff whose functions relate directly to the educational function of the college" under section 24–50–135(1)(c), 7 C.R.S. (1999). The exemp-

3. Metro also is now involved with educational programming at Mount View, a juvenile detention facility.

4. Metro labels the Lab School instructors "contract administrators" under its classification system.

tions required that the experience and qualifications of the new Lab School teachers be comparable to those required of other Metro faculty members.

During the transition from the old system to the Lab School, Adamek advised existing Lookout Mountain teachers that they had two options: (1) they could remain at Lookout Mountain by applying for teaching positions through Metro; or (2) if they were not selected or chose not to apply, they could request and receive a transfer to another position in DHS. If the teachers accepted positions with Metro, they would be at-will employees and give up the protection provided by the state personnel system. If they chose to accept a transfer within DHS, they would remain part of the classified service, with full status and benefits.

Metro advertised in the newspaper and interviewed other candidates along with the current teachers at Lookout Mountain to fill the eighteen Lab School instructor positions. Metro selected twelve of the former classified teachers at Lookout Mountain for the Lab School. None of these teachers contested the contract or their transfers. Six other classified teachers applied, but were not selected. Several teachers took transfers to other positions within DHS. None of the transferred teachers lost pay, status, or seniority in the transition.

The Lab School has become a national model for juvenile correctional education, and the project has received several national grants. Students now have the opportunity to receive meaningful education and training. The breadth of the curriculum and the number of instructors have expanded, with forty to fifty interns working at the school during the 1995–1996 school year. The greater number of student teachers working under the supervision of master teachers increased the teacher to student ratio, and allowed more individual student attention. As a result, the ALJ found,

> [W]hat has changed drastically is the enthusiasm, expertise, creativity, know how,

resources, training and manpower put into providing education services.... The Lab School offered the residents at Lookout Mountain an applied curriculum intended to show the youths how to use academics for practical purposes. Normative culture was instituted to utilize peer pressure to effect positive behavior changes among the residents.

### B.

Three of the transferred teachers-Thomas May, Frank Vallero, and John Wharrier-contested their transfers and filed grievances with DHS on August 1, 1994.

May and Vallero had applied for the Lab School, but were not selected. DHS transferred them from Lookout Mountain to their current positions teaching a health module at Adams Youth Detention Center and Mount View Youth Detention Center, respectively. Each teacher received his first choice of a new job site. Prior to his transfer, May had been employed by the state in juvenile corrections education for thirty-three years and was certified in secondary-level biological sciences. While at Lookout Mountain, he taught mathematics. Vallero worked in state corrections education for thirty-four years and was endorsed in social studies and business education. At Lookout Mountain, he taught social studies. The health curriculum that May and Vallero now teach is structured and the teachers have no discretion in the presentation of the material. The health module takes place after the regular school day, so May and Vallero work different hours than they worked at Lookout Mountain.[5]

Wharrier decided not to apply for a position at the Lab School, as he did not want to relinquish rights afforded him by the state personnel system. As a result, DHS transferred him from a teaching position at Lookout Mountain to a diagnostic position at Mount View detention center where he assesses incoming youth to identify special education needs.[6] Wharrier had been employed

---

5. In the process of reviewing May and Vallero's grievances, Director Adamek offered to change some of their scheduled hours to accommodate the teachers' desire for a regular classroom schedule.

6. Director Adamek offered Wharrier the option of a teaching position in a detention center if

in state juvenile corrections for eleven years in elementary education, focusing on special education needs. He holds a master's degree in special education. Wharrier also received his first choice of a new work location.

In their grievances, the complainants contended that their new positions are nonteaching positions that do not allow them to exercise discretion in the educational process. They also contested the changes in their work location and hours.

The complainants and CAPE petitioned the State Personnel Board (the Board) for declaratory relief on August 8, 1994. The petition challenged the exemptions of the new Lab School teachers, the authority of DHS to enter into the contract, and the transfers of the individual complainants. The petition sought a declaratory order that the exemptions violated the state constitution, that the transfers of the complainants violated their rights within the classified personnel system, and that the teachers should be reinstated to their former positions.

After holding a public hearing, the Board consolidated the actions and determined that it did not have enough information to determine whether the complainants were entitled to declaratory relief. On November 18, 1994, the Board directed the ALJ to conduct an evidentiary hearing to determine whether declaratory relief was appropriate and whether CAPE had standing. The parties agreed to bifurcate the issues, and in an initial decision released on September 8, 1995, the ALJ determined that CAPE had standing to represent the interests of its members. That portion of the ALJ's decision is not before us today.

The ALJ then conducted a hearing on the merits in October and November 1995. In her initial decision dated April 5, 1996, the ALJ determined that the complainants were not entitled to declaratory relief because they had not established a violation of any applicable statutory provision, rule, or order of the Board. The ALJ also upheld the Department of Personnel's decision to exempt Lab School teachers from the classified system, rejecting the argument that the exemptions

violated the Colorado Constitution. The ALJ further upheld the subsequent transfer of the complainants. The ALJ first found that the positions to which the complainants were transferred fit within the classified service description of teacher and that the complainants were not adversely affected by the transfer. The ALJ reasoned that the Department's decision was not arbitrary, capricious, or contrary to the rule of law.

In September 1996 the Board adopted the ALJ's findings of fact and her conclusion that the grievances were without merit. The complainants then appealed the Board's decision to the court of appeals.

## C.

The court of appeals reversed the ALJ and the Board's decisions, directing the Board to grant declaratory relief and uphold the grievances. *See May v. Department of Human Servs., Office of Youth Servs.*, 976 P.2d 281, 286 (Colo.App.1998). The court first determined that the transfers violated the Civil Service Amendment to the state constitution. *See id.* at 283–85. The court read the amendment to provide that all persons who teach in reformatory institutions must be part of the classified system. *See id.* at 285. The court concluded that the Board's exemptions violated the amendment because it replaced classified employees with nonclassified employees while the teaching positions at Lookout Mountain remained substantially the same. *See id.* at 284. The court found that the exemptions further violated the amendment because exemptions are specifically authorized in the state constitution, and thus, the Department of Personnel did not have authority to grant other exemptions. *See id.* Therefore, the exemptions and the subsequent transfers denied the teachers their constitutional rights. *See id.* at 286.

The court also found that DHS did not have the statutory authority to enter into a contract with Metro. *See id.* at 285. Although the Department may lawfully contract with other public or private facilities, the court held that the Department may not delegate to other entities its statutory duty

Wharrier preferred a classroom setting to his new position.

to educate juveniles. *See id.* The court concluded that "the responsibility for *operating* a facility for educating and training juveniles ... cannot be relinquished by it by the simple device of contracting with [Metro] to provide teachers for its facility." *Id.* The State now appeals that ruling.

## II.

The first question on certiorari asks whether the court of appeals' decision to void the complainants' transfers was appropriate under existing law. In order to reach that ultimate question, we first must analyze the application of the Civil Service Amendment and the State Personnel System statute to the circumstances presented here.[7]

## A.

The Colorado Civil Service Amendment, Colorado Constitution, article XII, section 13, establishes the personnel system for state government. It provides that all appointments and promotions be made according to merit and fitness. *See id.* § 13(1). The amendment presumptively places all state government positions within the classified system, subject to certain specified exemptions. *See id.* § 13(2). Specifically, the amendment states:

> (2) The personnel system of the state shall comprise all appointive public officers and employees of the state, except the following: ... faculty members of educational institutions and departments not reformatory or charitable in character, and such administrators thereof as may be exempt by law;
>
> ...
>
> (8) Persons in the personnel system of the state shall hold their respective positions during efficient service or until reaching retirement age, as provided by law.

*Id.* §§ 13(2), (8).

This amendment has been part of the constitution for over eighty years. *See People v.*

*Bradley,* 66 Colo. 186, 187, 179 P. 871, 871 (1919). At the time of its adoption, the General Assembly occasionally had refused to make appropriations for civil service employment. *See id.* at 190, 179 P. at 872. The amendment was initiated in response, "for the very purpose of avoiding the destruction or emasculation of the law in the future by some possible hostile General Assembly." *Id.* This court has since held that the purpose of the law is "to secure efficient public servants for positions in government." *Colorado Ass'n of Pub. Employees v. Department of Highways,* 809 P.2d 988, 991 (Colo.1991).

The constitutional amendment protects civil service employees from termination from the merit system without cause. *See id.* However, it does not specify either the services that state employees must perform or any criteria for delineating, enlarging, or reducing the personnel system. *See id.* at 992.

The exemptions from the state personnel system listed in the constitution are limited. Faculty members of educational institutions are exempt; however, the exemption does not cover educational faculty at institutions that are reformatory in character. *See* Colo. Const. art. XII, § 13(2). Faculty of educational institutions are exempt because the university tenure system replaces the protections of civil service employment. *See Board of Educ. of State of Colo. v. Spurlin,* 141 Colo. 508, 517, 349 P.2d 357, 362 (1960).

The Civil Service Amendment operates in conjunction with the State Personnel System Act, which was enacted to implement the constitutional provisions. *See Highways,* 809 P.2d at 993. The Act expansively defines the higher education exemption to include positions other than those bearing the title of faculty member. Section 24–50–135, 7 C.R.S. (1999), provides:

> (1) Administrators employed in educational institutions and departments not charitable or reformatory in character shall include the following, who shall be exempt from the state personnel system:

---

7. The first question on which certiorari was granted asks "[w]hether the Court of Appeals disregarded established governing law by voiding the transfer of respondents May, Vallero, and Wharrier ("grievants")." We did not grant certiorari on another question that more explicitly raised the constitutional concerns; however, the parties briefed and argued the constitutional issue and we find it to be implicit in, and necessary to, a resolution of the first certiorari issue.

...

(c) Heads of administrative units and their professional staff assistants who relate directly to the educational function of an educational institution and whose qualifications include training and experience comparable to that required for a faculty member;

...

(2) The state personnel director, in consultation with the officers of such educational institutions or departments, shall determine which administrative positions, under the definitions enumerated above, are exempt from the state personnel system, subject to an appeal to the board.

As with the Civil Service Amendment, the overarching purpose of the state personnel system is "to assure that a well-qualified work force is serving the residents of Colorado." § 24–50–101(3)(a), 7 C.R.S. (1999).

The complainants argue simply that the exemptions of the Lab School teachers from the civil service system violate the Civil Service Amendment because the teachers continue to teach at a reformatory institution, and are therefore, not eligible for exemption.

### B.

■ Based on the structure of the agreement between DHS and Metro, we reach a different conclusion. We conclude that the Metro/DHS Lab School agreement satisfies the mandates of the Civil Service Amendment and the State Personnel System Act in two ways. First, the Lab School teachers are fundamentally employees of Metro, not DHS. Therefore, they are employees of an educational institution that is constitutionally exempt from the personnel system. Second, no classified employees were separated involuntarily from their protected positions.

Under the Lab School agreement, Lookout Mountain teachers effectively are employees of Metro. Metro hires the teachers, assigns their duties, pays them, and evaluates them. Teachers report directly to Metro administrators. DHS retains little control over the day-to-day activities of the individual teachers, even though it provides funding for the school and retains authority over the Metro contract as a whole.

Certainly there is no question that all of Metro's teaching staff are exempt. The only difference between Metro teachers in the Lab School and other Metro employees is that the Lab School teachers have a different job location-the Lookout Mountain campus. According to the parameters of section 24–50–135(1)(c), the Lab School teachers need not even be labeled faculty members in order to fall under the higher education institution exemption from the classified system. Were we to hold that the Lab School teachers lost their exemption from civil service because of their assignment to a different job location, we would be elevating form over substance. Certainly, the character of the employer carries greater constitutional significance than the situs of the employment. Accordingly, since the teachers are functionally employees of Metro, the Department of Personnel's decision to grant the exemption did not violate the Civil Service Amendment.

■ We recognize that the driving purpose of civil service system laws is the protection of state employees from involuntary termination, and under the facts presented to us, no state employee was forced to leave the personnel system. In prior cases, this court has held state agency reorganizations unconstitutional when state employees were terminated without being provided the option of remaining within the state personnel system. For example, in *Colorado Ass'n of Public Employees v. Board of Regents*, a statute reorganizing University Hospital would have eliminated several thousand civil service jobs. 804 P.2d 138, 141 (Colo.1990). Hospital employees had two choices-join the new private hospital or remain in the classified system for no more than two years. *See id.* at 144–45. Employees did not have the option of permanently remaining in the classified system. *See id.* Similarly, in *Colorado Ass'n of Public Employees v. Department of Highways*, a reorganization of the Department of Highways would have eliminated civil service jobs and contracted out the duties of those employees to private vendors. 809 P.2d 988, 990 (Colo.1991). In *Horrell v. Department of Administration*, new legislation directed the

Department of Administration to contract for maintenance work on state grounds with community groups who hired developmentally disabled persons. 861 P.2d 1194, 1196 (Colo.1993). As a result, state employees were either terminated or transferred to lesser paying positions by the Department, and then the Department contracted out for those positions. *See id.*

In each of these cases, the court held that the constitution did not allow the involuntary separation of classified employees from state service. *See Horrell,* 861 P.2d at 1200; *Highways,* 809 P.2d at 995; *Regents,* 804 P.2d at 146. The court held that the employees must be allowed to continue working under the protection of the merit system. *See Regents,* 804 P.2d at 146.

These cases, however, do not govern the facts before us today for the simple reason that in the reorganization creating the Lab School, no employee was involuntarily forced out of the civil service system. Each teacher was given the option of remaining within the classified system with no adverse impact on pay, status, seniority, or benefits. In fact, every former teacher at Lookout Mountain could have remained within the civil service system. Those who decided to remain were transferred-a step wholly within the administrative authority of DHS. *See* discussion *infra,* part II.D. The teachers who chose not to remain left voluntarily. Nothing in the constitution or the state personnel statute would prevent teachers from freely deciding to accept positions with an exempt arm of state government such as Metro. Because the Metro agreement afforded civil servants the option of continued protection of the merit system, the Lab School exemption did not violate the constitution.

Hence, this is not a case wherein classified employees lost their positions. In *Bardsley v. Colorado Department of Public Safety,* the state eliminated an agency division in response to budgetary pressures and transferred the division's responsibilities to another department within state government. 870 P.2d 641, 644–45 (Colo.App.1994). All the classified employees were terminated. *See id.* Although some of the employees eventually were hired back into the classified system by the new agency, they lost some benefits and status in the process. *See id.* at 645. The court of appeals ruled that if the duties of the positions in the new department were substantially similar to those in the old division, the state could not terminate employees from civil service and fill the jobs with new employees without violating the constitution. *See id.* at 647. *Bardsley* presents different concerns than are present in this case precisely because it involved the termination of employees. Because no classified employees were terminated, the reorganization did not violate the constitution, even though the new Lab School positions are substantially similar to the teaching positions before the reorganization.

### C.

Metro teachers are themselves state employees, albeit not protected by civil service. Contrary to the complainants' arguments, this is not a case implicating the concerns of privatization. *Cf. Highways,* 809 P.2d at 992–97 (holding that shifting job duties from classified state employees to private vendors violates the state constitution and the statute governing personal services contracts). In striking down an effort to privatize services previously provided by the Department of Highways, this court expressed concern that when privatization removed employees from the state system, the employees would be left without the protections of the merit system. *See id.* at 994. Such protections included competitive tests of competence, protections from arbitrary and oppressive treatment, and due process procedures before disciplinary action or termination. *See id.*

Privatization concerns are not applicable here because the teachers were transferred to another political subdivision of the state. Evidence in the record does not suggest that the Lab School teachers are exposed to the "dangers" of private employment as Metro employees.

Ultimately, the Civil Service Amendment and the state personnel system strive to provide the most efficient service for the public. *See* § 24–50–101(3)(a). Here, the ALJ found that the Lookout Mountain students' poten-

tial for success has increased following the implementation of the Lab School. Adding student teachers to the regular corps of instructors has increased the personal attention that the students receive. Overall, the facility has undergone a dramatic change in attitude. Clearly, the Metro contract provides the most efficient service to Lookout Mountain juveniles. Improved student performance, in turn, benefits all Colorado citizens by reducing recidivism and increasing the social productivity of troubled juveniles.

Government is subject to unprecedented demands in today's world. We expect innovation, success, efficiency, and economy. Metro and DHS are attempting to meet those demands in a way that violates neither the letter nor the spirit of the Civil Service Amendment.

### D.

■ We also view the Lab School exemptions as consistent with the state personnel system statute and the juvenile facilities statute. The complainants' challenge the fact that individuals were transferred due to a reorganization of positions to accomplish specific policy goals, not because of their personal job performance. We conclude that DHS's reallocation of the positions was proper, under the general mantle of the Department's authority to create and terminate positions, assign personnel, and transfer them.

■ Appointing authorities, such as DHS, generally have the authority to conduct a reorganization in order to accomplish specific policy goals. *See, e.g.,* § 24–50–101(3)(d), 7 C.R.S. (1999). For example, in *Hughes v. Department of Higher Education,* the court found that a university had discretion to reorganize in order to effectuate its "mission and core values, its program priorities and focus, and the initiatives it hopes to emphasize in its future development.... With regard to matters of this nature, the University possesses broad discretionary authority to develop and adopt its plans." 934 P.2d 891, 895–96 (Colo.App.1997); *see also Department of Insts. v. Kinchen,* 886 P.2d 700, 710 (Colo. 1994) (noting that "[a] reallocation decision is part of the necessary review of work functions that an employer must make periodical-

ly to assure organizational efficiency"); *Sutton v. University of S. Colo.,* 870 P.2d 650, 652 (Colo.App.1994) (observing that a university police force reorganized in order to respond to "top heavy" management and changing circumstances at the college).

Such a reorganization may necessarily involve eliminating some positions in order to promote the agency's strategic goals. "Layoffs may result from reorganization which represents a change in the fundamental structure, positions, and/or functions accountable to one or more appointing authorities." 4 C.C.R. § 801–1, R–7–8 (1999); *see also City & County of Denver v. Norris,* 131 Colo. 259, 264, 281 P.2d 160, 162 (1955) (restating the "well established" principle that civil service positions may be abolished if they are no longer a public necessity).

Even without a large-scale reorganization, DHS may manage personnel in a manner that will most effectively accomplish the Department's duties. The state personnel system statute outlines that, "[t]he heads of principal departments ... shall be responsible and accountable for the actual operation and management of the state personnel system for their respective departments." § 24–50–101(3)(d); *see also* 4 C.C.R. § 801–1, R–1–6 (1999) ("Appointing authority powers include, but are not limited to: hiring and evaluating performance; ... defining a job; ... determining work hours and safe conditions and tools of employment; identifying and administering layoffs....").

■ Employees are not permanently frozen into the same position just because they are hired under the state personnel system. State government faces an ever-changing array of social problems, and agencies must have the flexibility to create solutions to those problems, including transferring workers to different positions as circumstances warrant. *See* § 24–50–121, 7 C.R.S. (1999) ("Employees may be transferred between positions in the same class or related classes on request and with approval of the appointing authorities concerned."); *see also* 4 C.C.R. § 801–1, P–4–3 (1999) ("At the discretion of the appointing authority, transfers and non-disciplinary de-

motions may be considered. . . ."). As long as the transfer of a classified employee does not alter his pay, status, or seniority, the Department has plenary authority over transfers. A

> [t]ransfer is an appointment of a qualified employee to a different position in the same class or with the same job rate. . . . If the transfer is within the same agency, it is at the discretion of the appointing authority(s), and if the employee refuses it, the employee is deemed to have resigned.

4 C.C.R. § 801–1, P–4–5; *see also Zagar v. Colorado Dep't of Revenue,* 718 P.2d 546, 548 (Colo.App.1986) (finding that an employee could not refuse a transfer where his base pay, status, and seniority remained unchanged). Although the classified system protects pay, status, and seniority, it does not guarantee a specific work location or scheduled hours. *See Zagar,* 718 P.2d at 548 (upholding a transfer to a new location, over the employee's objection).

The directive of the juvenile facilities statute is consistent with the principles outlined in the state personnel system statute. That juvenile facilities statute states:

> The director of the division of youth corrections may appoint, pursuant to section 13 of article XII of the state constitution, a director and other such officers, teachers, instructors, counselors, and other personnel as the director may consider necessary to transact the business of the schools and may designate their duties.

§ 19–2–414(3), 6 C.R.S. (1999). This indicates that DHS has considerable latitude to make assignments and transfers to effectuate its goals. Coupled with the state personnel system sections, the statutory scheme as a whole demonstrates that the legislature intended that DHS have significant discretion in directing personnel to carry out its mission.

In this case, the Department clearly had the authority to transfer the complainants to new positions within the Department. Even absent the Lab School contract, DHS could have reorganized and transferred the complainants to teach in the health module in order to meet the Department's need in that area. Although the subject matter they taught changed, and their work hours and location altered, none of the individuals suffered a loss of pay, status, or seniority from their transfers. All three complainants continued to be entitled to the same rights and benefits under the classified system. As a result, the ALJ correctly determined that the complainants suffered no adverse effects, and thus, the transfers were proper.

The complainants nonetheless contest their transfers because their new positions within the DHS do not fit the definition of "teacher." They claim their new positions do not afford them the same discretion in choosing teaching materials and methods as their previous positions. The ALJ rejected this argument, finding that "[i]n all important respects, the duties performed by Complainants May and Vallero in the health initiative, and by Complainant Wharrier, as a diagnostician fit the description of the 'Teacher I' classification." The ALJ's determination comports with the general principle that in assessing the propriety of a transfer, courts should look to the position's actual duties, not the title. *See Regents,* 804 P.2d at 146; *see also Kelly v. Milliken,* 74 Colo. 456, 457–58, 223 P. 40, 41 (1923). Competent evidence in the record supports the ALJ's findings, and we, therefore, refuse to substitute our judgment on review.

Complainants further argue that the agreement was essentially a sham reorganization designed to oust the teachers from their state employment. It is true that transfers may not be made under the rubric of a "reorganization" if the agency's true motive is to remove positions from the classified system. *See Highways,* 809 P.2d at 995. However, the complainants have not proved any subterfuge on the part of the Department. After conducting a lengthy evidentiary hearing, the ALJ found that the Department followed proper procedures in granting the exemptions. The record also demonstrates that DHS did not create the health module as a mechanism to slough off teachers who resisted the transfer to Metro. Director Adamek had been organizing the health module program prior to the transfers. The ALJ's conclusion that the trans-

fers were not arbitrary, capricious, or contrary to law is supported by the record, and thus, must be respected by this court.

### III.

The second issue on certiorari questions the statutory authority of DHS to contract with Metro to provide educational programming at Lookout Mountain. The court of appeals determined that DHS could not contract with Metro because the Department was not authorized to delegate control of its programs to another state agency. We disagree.

The starting point in determining the scope of DHS's contracting authority is the Department's statutory responsibility to educate children in juvenile facilities. The juvenile facilities statute provides that "(1) There is hereby established ... a training school known as the Lookout Mountain school, under the supervision and control of the department of human services. (2) The school shall provide care, education, training, and rehabilitation for juveniles ... committed to the custody of the department...." § 19–2–406, 6 C.R.S. (1999); *see also* § 19–2–403, 6 C.R.S. (1999) (outlining general duties of DHS in operating juvenile facilities).

However, the statute does not dictate that DHS alone must perform the education and training services. Rather, DHS may contract with other public and private agencies to assist in carrying out its responsibilities.

> The executive director of the department of human services shall ... enter into agreements or contracts deemed necessary and appropriate with any governmental unit or agency or private facility or provider cooperating or willing to cooperate in a program to carry out the purposes of this article. Such contracts or agreements may provide ... for other matters relating to the care and treatment of juveniles.

§ 19–2–410(1), 6 C.R.S. (1999). The statute further states that "[t]he department shall cooperate with other governmental units and agencies, including appropriate local units of government, state departments and institutions, and agencies of the federal government in order to facilitate the training and rehabilitation of youth." § 19–2–403(2), 6 C.R.S. (1999).

Hence, the statutes governing juvenile facilities place no explicit restrictions on the Department's ability to contract with other service providers and to seek innovative solutions. The permissive language of the statutes suggests that the General Assembly intended the Department to explore alternatives for education and rehabilitation.[8]

The complainants argue that although the statute allows cooperation with outside agencies and organizations, DHS cannot extend its cooperation so far as to delegate fully its agency responsibilities to another entity. Only the legislature can effectuate a transfer of duties. *See Bardsley v. Colorado Dep't of Pub. Safety*, 870 P.2d 641, 650 (Colo.App. 1994). The complainants contend that by entering into the Metro contract, DHS infringed on the authority of the General Assembly.

On the contrary, DHS has designed an innovative system that in fact gives new life to its responsibility to educate juvenile offenders. The agreement between DHS and Metro establishes a collaborative partnership for a fixed term of five years. DHS provides staff support, and retains control of the building, responsibility for security, and other operations at the facility, while Metro provides year-round educational services, including determining the curriculum, hiring and paying the teachers, making assignments, and providing computer software and surplus equipment. Metro has control over the day-to-day activities of the teachers, but DHS retains authority over the contract as a whole. For example, although Metro directs the educational program, a DHS employee fills the position of education director, and she provides leadership and monitoring, as well as ensures that the school meets accreditation, state, and federal standards. The

8. Sections 19–2–403, –406, and –410 existed prior to 1996 when the General Assembly overhauled the juvenile justice statutes. The retention of these sections indicates a continuing intent by the legislature that DHS work with outside groups to improve juvenile rehabilitation services.

education director retains final decision making authority in any disputes within the joint management team. DHS budgets for the program and is answerable to the General Assembly for those dollars.

In the final analysis, DHS is the agency that is accountable for the success of the educational efforts being conducted at Lookout Mountain. DHS is not impermissibly delegating its responsibility to educate juvenile offenders; it is partnering with an entity better able to fill the need. Because DHS retains significant authority and ultimate accountability for the success or failure of the program, the Lab School agreement is entirely within the Department's statutory authority and is consistent with the directives of the juvenile facilities statute.[9]

DHS historically has contracted extensively with other agencies and private groups to provide a variety of services. In fact, Director Adamek testified before the ALJ that private contractors perform two-thirds of OYS services and the state operates only one-third of the programs. For example, DHS currently contracts with a private corporation in Colorado to run a secure facility for high-risk youth and a boot camp. The Department contracts with Jefferson County for a psychiatric facility. DHS also has several out-of-state contracts with a wilderness program in Utah, a boot camp/educational facility in Nevada, and a school for severe delinquents in Pennsylvania. The Department also contracted with Red Rocks Community College to provide vocational programming. The legislature further has required that educational programming in DHS detention centers be conducted by local school districts, using teachers who are not classified employees. *See* § 19–2–402(3)(a), 6 C.R.S. (1999). Adamek testified that the Department has had a "highly successful experience" with private contractors, and that the process holds

down the state's costs. None of these contractors is required to hire only classified state employees. We find no substantial difference between DHS's authority to enter into these contracts and its authority to contract with Metro for educational programming on Lookout Mountain grounds.

### IV.

In conclusion, we find no legal flaw in DHS's creation of the Lab School in cooperation with Metro. The Department of Personnel's decision to exempt the Lab School instructors from the state personnel system did not contravene either the constitution or the statutes governing the state personnel system and juvenile facilities. Under the agreement, the Lab School instructors are effectively Metro employees. As employees of a higher education institution, they are exempt from the state personnel system.

Likewise, the transfers of the individual complainants were proper. The reorganization provided teachers with the option of remaining in the classified system, and the teachers who chose to do so suffered no material adverse effects. The complainants have retained their pay, status and benefits. Any changes made in their hours, duties or location were changes that were within the agency's discretion.

We also find that DHS had statutory authority to enter into the Lab School agreement. The Department has not abdicated its duty to educate and train juveniles because it retains ultimate responsibility for the success of the program.

The Lab School has revitalized a failing program and brought meaningful educational opportunities to the students. The partnership has infused new creativity and enthusiasm into Lookout Mountain's mission to rehabilitate juvenile offenders. Certainly, this is consistent with the purpose of the constitu-

---

9. In this opinion, we reach two principal conclusions: first, that the teachers at Lookout Mountain are Metro employees and thus need not be included in the state personnel system, and second, that DHS is ultimately answerable for the success of the program and has not impermissibly delegated its responsibilities. We find no contradiction between these two conclusions.

Although Metro has discretion over the day-to-day operations such as curriculum choices and teaching methods, the final responsibility for the program is clearly and unequivocally that of DHS. Contracting with a state higher education institution to perform that function in no way alters DHS's ultimate accountability.

tion and personnel statutes in bringing about effective public service. Accordingly, we reverse the court of appeals.

Chief Justice MULLARKEY concurs in part and concurs in the result.

Chief Justice MULLARKEY, concurring in part and concurring in the result:

I concur with Part II.D and Part III of the majority's opinion holding that the Department of Human Services' (DHS) transfer of teachers from the Lookout Mountain juvenile corrections facility (Lookout Mountain) complies with the relevant statutes and regulations, and that the DHS acted within its authority in contracting with Metropolitan State College of Denver (Metro). I also concur with the majority's ultimate conclusion in Part II.B that the reorganization of the educational program at Lookout Mountain did not violate article XII, section 13 of the Colorado Constitution. However, because I believe the majority fails to address adequately the potential concerns raised by article XII, section 13, I do not join its reasoning and I concur in the result only.

Colorado has established its state personnel system through the integration of constitutional amendments, see Colo. Const. art. XII, §§ 13–15 (the Civil Service Amendment), statutory provisions, see § 24–50–101 to –706, 7 C.R.S. (1999) (the State Personnel System Act), and regulatory rules and procedures, see 4 C.C.R. § 801–1 et seq. (1999).[1]

These sections of the Colorado Constitution and the associated statutory and regulatory provisions provide for two broad categories of state employees—employees within the state personnel classification system, and those exempt from it. Article XII, section 13 makes this delineation, stating, in relevant part:

The personnel system of the state shall comprise all appointive public officers and employees of the state, except the following: ... faculty members of educational

institutions and departments not reformatory or charitable in character....

Colo. Const. art. XII, § 13(2).

For those employees within the state personnel system, the Civil Service Amendment provides that appointments or promotions must be premised on "merit and fitness, to be ascertained by competitive tests of competence without regard to race, creed or color, or political affiliation." Id. § 13(1). Further, employees within the personnel system "shall hold their respective positions during efficient service." Id. § 13(8).

There is no dispute here that the teaching positions at issue are filled by state employees. The question is whether those teaching positions are within the state personnel system or are exempt from it. This issue is raised because article XII, section 13(2), quoted above, creates an exemption from the personnel system for faculty members "of educational institutions and departments." Id. § 13(2). However, that exemption does not apply to educational institutions and departments that are "reformatory or charitable in character." Id. For convenience, I will refer to these two parts of subsection (2) as the "faculty exemption" and the "reformatory exception." If a position is within the faculty exemption, it is exempt from the state personnel system. If a position comes within the reformatory exception, then it is within the state personnel system.

The majority holds that the Lab School Agreement satisfies the requirements of the Civil Service Amendment and the associated provisions of the State Personnel System Act because (1) the Lab School faculty are employees of Metro, an educational institution exempt from the personnel system; and (2) the classified employees at Lookout Mountain prior to the reorganization were not involuntarily separated from the state personnel system. With respect to the first conclusion, the majority asserts that "since the teachers are functionally employees of Metro, the Department of Personnel's decision to grant the exemption did not violate the Civil Service Amendment." Maj. op. at 20. I am concerned, however, with the ma-

1. Over the extended history of the state personnel system, the constitutional, statutory, and regulatory provisions have undergone a number of amendments that are not implicated by this case.

jority's failure to articulate why the faculty of Metro working at a reformatory such as Lookout Mountain come within the scope of the faculty exemption for "faculty members of educational institutions and departments not reformatory or charitable in character." I, therefore, write separately to expand on what I believe is the rationale supporting this conclusion.

As stated previously, subsection (2) of article XII, section 13, which sets forth several exemptions from the personnel system, states that "the personnel system of the state shall comprise all appointive public officers and employees of the state except ... faculty members of education institutions and departments not reformatory or charitable in character." *See* Colo. Const. art. XII, § 13(2). This provision is subject to two potential constructions, one focused on the function or job duties of the position and the other focused on the employer of the position. First, the provision may be interpreted as providing a functional limitation on the faculty exemption by precluding application of that exemption for those faculty members performing educational duties at a reformatory. Under this approach, the Lookout Mountain teaching positions, and the faculty that fill those positions, would come within the reformatory exception to the faculty exemption and must be included in the state personnel system. The court of appeals adopted this interpretation, concluding that the teachers at the reorganized Lookout Mountain facility "must be considered to be 'faculty members' at a 'reformatory.' As such, any person filling such a position must be a member of the classified service." *In re May*, 976 P.2d 281, 286 (Colo.App.1998).[2]

Second, and in my view more appropriately, the phrase "reformatory or charitable in character" can be interpreted to describe the type of "educational institution or department" that employs those positions and faculty members. Under this interpretation, the appropriate inquiry is not a functional test of the duties assigned to the position. Rather, this approach seeks to determine (1) whether the employer of that faculty member is an educational institution or department and thus the position is within the faculty exemption, and (2) whether that employer is reformatory in character and thus the position is within the reformatory exception.

The constitutional language—"faculty members of educational institutions and departments not reformatory or charitable in character"—supports adopting the second approach. Had the drafters intended to limit the faculty exemption so that it would exclude all faculty members teaching in an institution that is reformatory in character, they could have done so in a direct manner. Instead, they refer to "faculty members of educational institutions or departments" rather than to faculty members of reformatory or charitable institutions. This choice of wording suggests to me that the location where a faculty member teaches is not determinative of the applicability of the faculty exemption.

Further, another exemption within subsection (2) demonstrates that the drafters of this amendment contemplated and articulated an exemption from the personnel system based on both the job duties performed and the employer of the positions in question. Subsection (2) exempts "the employees in the offices of the governor and the lieutenant governor whose functions are confined to

---

**2.** To support its position adopting this approach, the court of appeals references this court's decision in *Board of Education v. Spurlin*, 141 Colo. 508, 349 P.2d 357 (1960). In that case, this court determined that the then-current articulation of the faculty exemption to the state personnel system included administrators within the Department of Education. *See id.* at 520, 349 P.2d at 363. In doing so, the *Spurlin* court stated that "it was the intention of the people in adopting Article XII, Section 13 to exclude from the classified service all educators except those who teach in institutions reformatory or charitable in character." *Id.* However, whether an in-

stitution was reformatory or charitable in character was not implicated in that case. Further, the *Spurlin* decision addressed constitutional language different from that before us today. *See id.* at 510, 349 P.2d at 358 (reproducing the amendment in force at the time, which excluded from "classified civil service" "officers and teachers in educational institutions not reformatory or charitable in character."). For these reasons, I do not view this isolated language in *Spurlin* to compel a result in this case. *Cf. Main Elec. Ltd. v. Printz Servs. Corp.*, 980 P.2d 522, 526 & n. 2 (Colo.1999) ("Dictum is not the law of the case and is not controlling precedent.").

such offices and whose duties are concerned only with the administration thereof." Colo. Const. art. XII, § 13(2). Through the use of express language, the drafters of the amendment exempted from the personnel system employees of the governor or lieutenant governor who administer those two offices. An employee of the governor who worked in another executive department would not be exempt.

The faculty exemption, however, does not have a similar restriction. It says nothing about where a faculty member teaches. It addresses only the entity that employs the faculty member.

We must give effect to the contrasting language of the two exemptions within the same constitutional subsection. *Cf. De'Sha v. Reed,* 194 Colo. 367, 371, 572 P.2d 821, 823 (1977) (recognizing that provisions of the Colorado Constitution should be construed in the context of the constitution as a whole); *cf. Zamarripa v. Q & T Food Stores, Inc.,* 929 P.2d 1332, 1341 (Colo.1997) ("[This court] must construe the statute as a whole so as to give consistent, harmonious, and sensible effect to all its parts . . . ." (internal quotation marks omitted)). This basic principle of construction leads me to conclude that the drafters did not intend to adopt a functional test for the faculty exemption. That is, the phrase, "not reformatory or charitable in character," does not describe the place of performance or the particular duties required of a faculty member in order to come within the faculty exemption of the personnel system. Thus, I would conclude that the reformatory exception describes the employer, i.e., the subset of educational institutions or departments whose faculty members are subject to, rather than exempt from, the personnel system.

Section 24–50–135 of the State Personnel System Act further supports such a conclusion, providing that "[a]dministrators [meeting certain criteria] *employed* in educational institutions and departments not charitable or reformatory in character . . . shall be exempt from the state personnel system." § 24–50–135(1), 7 C.R.S. (1999) (emphasis added). This section illustrates that it is the nature of the employing entity—whether that entity is reformatory in character—that determines whether the positions in that organization fall within the state personnel system.

Applying this interpretation of subsection (2) to the case at hand, I would reach the conclusion that all faculty members of Metro are excluded from the state's personnel system. Like the majority and for the reasons set forth in its opinion, I would conclude that the new faculty of the Lookout Mountain facility are employees of Metro. *See* maj. op. at 166. Because only a small component of the operation of Metro is reformatory in nature, I would conclude that Metro is not an educational institution that is reformatory in character. Consequently, the exemption found in article XII, section 13(2) for "faculty members of educational institutions and departments not reformatory or charitable in character" would apply to exempt the faculty positions of the Lab School from the state personnel system. Therefore, like the majority, but through an expanded analysis, I would hold that all faculty members of Metro are excluded from the state's personnel system.

Based on this reasoning, I would hold that the allowable transfer, *see* maj. op. at Part II.D., of personnel system employees from Lookout Mountain and the subsequent employment of faculty members in positions not subject to the personnel system do not implicate the privatization concerns this court has addressed in the past. *Cf. Horrell v. Department of Admin.,* 861 P.2d 1194 (Colo.1993); *Colorado Ass'n of Pub. Employees v. Department of Highways,* 809 P.2d 988 (Colo.1991).

Because the majority's analytic approach fails to address adequately the application of article XII, section 13 to the issues raised by the Lab School Agreement, I respectfully concur in the result, but must write separately with regard to the analysis used to reach that result.